on the case. Whoever's gonna argue, please step up and identify yourself. You want to try on your side on behalf of the defendant appellant. Assistant State's Attorney Brian Levinsky on behalf of the people of the state of Illinois. Hey, you understand that's not a speaker. So speak up loudly. We're gonna try and limit you because one of the justices would like to get out of here before 1230. So no repetition. Before 12 actually. He had to rat me out. Why not? I don't give many opportunities to do that. Good morning, Brian. Josiah's offices. Excuse me. Assistant Appellate Defender with the Office of the State Appellate Defender on behalf of the defendant appellate Gerard McKinney. May it please the court and counsel. McKinney's conviction for unlawful possession of a weapon by a felon should be reversed. Mr McKinney was convicted of possession of a weapon where neither the weapon or any photographs of the weapon ever showed up in court. And Holden, the officers Holden and Clinton's testimony regarding McKinney's purportedly inculpatory statement was thoroughly impeached. The only evidence that was left for the state to rely on was the impeached officer's superficial testimony asserting constructive possession. Because this superficial testimony was uncorroborated by even a scintilla, physical or photographic was directly contradicted by their contemporaneous written reports and each other's testimony. And both officers were rendered fundamentally unreliable. The court below made a mistake in relying on their testimony. And the evidence of trial showed that officers Clinton and Holden were on patrol in the evening of March 7th, 2016 in an unmarked vehicle. They observed Mr McKinney exit a building and walk in their direction. The officers testified that Mr McKinney grabbed the crotch area of his pants and made a limp while he walked. Mr McKinney then walked behind a parked vehicle that was positioned between he and the officers. And after a brief cat and mouse game with Mr McKinney behind the vehicle, the officers parked their car to engage in an investigatory stop. When they got out of the vehicle, they said they heard a clinking sound coming from the ground in the area near where Mr McKinney was standing. But critically, they did not see Mr McKinney actually drop any objects and they did not see him holding any objects, let alone a firearm. Officer Holden then detained Mr McKinney and Officer Clinton walked near where she heard the clinking sound and recovered what she described as a 40 caliber handgun. The state did not introduce the gun into evidence, nor were any photographs of the weapon introduced into evidence. The officer's arrest report said that Mr McKinney invoked his right to at trial. Officer Holden said that prior to being given Miranda warnings, Mr McKinney admitted that he did not have a Floyd card. And after being given a Miranda warning, Mr Holden asked Mr McKinney, excuse me, Officer Holden asked Mr McKinney if he had anything to say purportedly. And McKinney said he had the weapon for his protection. Officer Clinton, in contrast, said that McKinney was given his Miranda warnings and then protection before Holden asked him if he had a Floyd card, which he denied. Officer Clinton likewise admitted that she did not describe these events in her case incident reports. Holden and Clinton's credibility is critical and the only avenue for sustaining this conviction. There's no other evidence to support the state's case. No gun itself, no forensic evidence, no photographs or surveillance, no other witnesses. And the purported admission actually undermines rather than supports the officer's testimony. Clearly, the state cannot prove the case without their testimony. But their testimony is fabricated and fundamentally unreliable. On the absence of the gun at the trial, this division of this court has already held that the absence of the gun at the trial does not change the credible testimony of the officers. And the In this case, when, although the court below may have found the officers credible, it's our position that was a fundamental error where they were so thoroughly impeached and their own reports directly contradicted their testimony at trial. And so if they were otherwise credible and there was an absence of a weapon, that would be a different case than what's here. Is the court found that credible? That's correct. The court below did find that credible, yes. But it's our position that was a mistake and is a trial court that they were credible. That's true. And again, incredible testimony and the absence of the weapon. And again, also not just the absence of the weapon, but the absence of any kind of forensics or physical evidence. Did you offer the Campbell case? Yes, that we offer that in a motion. Did you look in the last paragraph of it where you cite people or Dehaney, which says you don't need any of those other things. And that's the most recent case that came down from this court. That's absolutely correct. And yes, you don't. There is clear law that you don't need those things when there's also other credible testimony here. It's our position that because there is no other evidence other than the officer's testimony to say that this weapon was present at all and to connect it. He was the only guy standing there where the gun was heard clinking to the ground. Is it correct? At that particular time, that is correct. Yes, he was the only person. There weren't 15 guys standing around. There was one guy. There was no testimony. There were other people. That specific point. There were other people in the area. There was one man, the defendant, when the cops heard the clinking sound. That was the testimony. After his evasive behavior, when he realized the police were watching. Well, I think that's a critical point as well. When you're saying after he realized the police were watching again, I think it's important to stress that police were in an unmarked vehicle. Yes, they were in an unmarked vehicle. Doesn't everybody recognize an unmarked police vehicle in the city of Chicago? Um, the question is, he wasn't taking evasive action, which is moving back and forth in this direction. He went in a different direction. So, uh, these are officers with experience and they believed it was evasive action. There was a testimony. I don't think they described it specifically as evasive, but there was testimony that he was engaged in this type of cat and mouse game, is I think what they described it, and that they then engaged in So again, turning to the officer's credibility, which is critical. The first area where they're incredible is they're incredible claim that Mr McKinney made this inculvatory statement about possessing the gun. Now, how do we know that? I think it's fair to say that he did not make that statement because simply the officer's own contemporaneous reports expressly contradicted that allegation. In addition, their testimony contradicted each other about the timing of when the statement was made. Now, the second aspect in which the officer's testimony is incredible is they say that Mr McKinney denied having a Floyd card. And again, their written reports dispute that assertion. The officer's own accounts vary as to when he reportedly made that admission. And so then we look at the critical claim that the officers say they recovered a gun that Mr McKinney possessed. And there, likewise, we can we can determine that that that assertion is not true. And how do we know that? Setting aside the fact that they never saw Mr McKinney in actual possession of the weapon or offered any evidence directly linking him to the weapon, again, they didn't offer a scintilla of evidence to prove that the alleged firearm ever existed or that it was a functional firearm as defined under the statute. There were no photos, no functionality tests, no specifics about the gun beyond a generic description, and critically, again, no gun itself. In addition, it makes no sense that Mr McKinney would have dropped the weapon when the police say he did because, again, they were an unmarked weapon and it was nighttime. They were engaging in what Mr McKinney may have perceived as a threatening behavior. So if he truly had the weapon for protection, as he allegedly said, it runs contrary to common sense that he would drop it before he ever knew if there were police or some other threat to his safety. Again, talking about the Campbell case, the officers here had a motive to fabricate without the gun. This wasn't just any little gun. This was a Glock 27 .40 caliber with one round chambered in 29 in the magazine, right? That's the testimony, yes. So that's just an insignificance. No, this would be quite a large firearm. Right. Yes. So you're calling this the Dropsy case? I think it's fair, although we didn't categorize it as such in our briefs, I think it is fair to consider the Campbell case and the whole thing regarding Dropsy cases as instructive here. Because there is a slight difference between this and a classic, what I would say, classic Dropsy case. Because the officers here didn't testify that they actually saw him throw the weapon, nor did they say that he dropped the contraband after they had engaged with him here. I believe their timeline is that it was before. When I'm looking at what you're arguing tends to go to the portion of the case that the judge threw out, the elements of this case, which he was convicted of. There's enough there under constructive possession to say, since nobody else is around, that it's his gun. You don't have to get to that other part. It's his gun. Do I just constructive possession when they find it? That if the officers were testifying credibly and they were not impeached and it was believable, then I think that there is a difference on his proximity to the firearm. But again, I think given that our position here is, given the lack of credibility for the officers combined with some of the other issues related to the constructive possession, that that adds up to be insufficient evidence to prove beyond a reasonable doubt that my client possessed this firearm. And again, there's also testimony about the number of people in the area, et cetera. So in terms of constructive possession, I think we would dispute that that's been proven by the state. And here again, like you said, the trial court did acquit Mr. McKinney of some of the charges but convicted him of the unlawful use of the weapons by a felon. And the court found that the officers failed to include important facts in their arrest reports that contradicted their testimony. But as to that? But despite those inconsistencies, the court still did find that they were credible. It's our position that the court was incorrect and evaluated the defendant's testimony without holding and Clinton's credibility, without applying the proper level of scrutiny that is applicable in a case like this per People v. Campbell. And in that holding where the court said that it's critical whenever an officer testifies that a defendant dropped contraband in plain view, the question then is, would the officer's detention or search of the defendant have violated the Fourth Amendment if he or she had not seen the defendant drop the contraband in plain view? And if the answer is no, then there's less reason to question the officer's credibility. If the answer is yes, then both the trial court and courts of review should take care to analyze the credibility of the officer because the incentive to lie, to avoid the suppression of the evidence is at its highest. And it's our position that that is precisely what happened here. And that the court below did not apply that careful analysis of holding and Clinton's credibility. But that when that, and it's appropriate for this court under Campbell to be more judicious, to be, apply that extra level of scrutiny to the credibility determination of the court below. And when that's done here, it's our position that Clinton and Holden's credibility crumbles and the conviction cannot stand if their credibility is not, if they are not credible. Now, the trial court and this court are obligated to carefully analyze the credibility of the officers because of that incentive to be dishonest. When analyzed carefully and with the proper critical eye, and when viewed in concert with the utter lack of physical, corroborating physical or forensic evidence, it's clear that the officer's testimony lacks sufficient reliability to support Mr. McKinney's conviction. If there are no further questions, we rely on the arguments presented in the briefs, which demonstrate that Officers Holden and Clinton's testimony was utterly incredible. And as a result, the state's evidence was insufficient to prove Mr. McKinney guilty beyond a reasonable doubt. Thank you. Thank you. May it please the court again, Assistant State's Attorney Brian Levinsky on behalf of the people of the state of Illinois. The question in this case is simply whether, after taking all the evidence in the light most favorable to the people, whether we establish each element of the offense beyond a reasonable doubt. And that's really where defendant trips because he's asking this court to reassess credibility determinations that were already considered by the trial court. The trial court found that these officers testified credibly. They credibly testified that this he was holding up in his pants. He had an observable limp. After hearing this metal clank when he's behind the caravan, they look. And importantly, he's not walking with the limp anymore. He's not holding the area of his crotch in his pants. So it's not just that we have metal objects that's found near where the defendant was, but we see that his own behavior and his own gait has changed in a way that suggests that the object was not simply near him, but he was, in fact, holding it up moments before. Defendant seems to be asking this court to find a reasonable hypothesis of innocence based on the fact that he alleges that this is a dropsy case. That's an argument for the trial court, and it's not one that this court should entertain because it's simply inconsistent with people versus Pintos. I would also just note that when defendant challenges the specific consistencies related to when the statements were made about the Floyd card and when he admitted that he had the gun for his protection, none of that goes towards the consistent testimony that the officers provided with respect to the actual offense in this case, which was his unlawful possession of the firearm itself. They testified consistently as to how they observed this defendant, how they approached him, hearing the metal clang, going in and then actually recovering a firearm. There was really no question in this case that the object was a firearm. It wasn't simply I saw a handgun and that's it. Officer Clinton testified, blue steel block, 27, 40 caliber, one chambered round, extended clip, magazine had 29 live rounds in it. This is a firearm. There's no question about it. Another thing I just wanted to briefly touch on is that much of what defendant talks about in relationship to the Fourth Amendment issues, which he's trying to insert into this case, simply are an effort to insert a square peg into the proverbial round hole. There was no Fourth Amendment litigation in this case. We don't know whether defendants started engaging in evasive behaviors immediately upon seeing the police officers, such that it might be construed more as unprovoked flight. Much of those questions simply weren't asked. In fact, when defense counsel started asking questions of that nature in cross-examination, we objected because it wasn't relevant towards the trial. So attempting to ask what evidence would have come out at such a motion to suggest that there was any Fourth Amendment issue here is simply not one that was developed below and shouldn't be entertained through the guise of a reasonable doubt claim on appeal. There are no further questions. For these reasons and those I didn't have a brief. I do have a question. This court is sort of a crazy quilt of rulings after Aguilar, and I would imagine that it makes everybody out on the street, people who have legal guns, people who have illegal guns, police officers, sort of confused about what they can and can't do. So this court has recently said that we're nervous about arresting first and asking about a void card later. And law also allows an officer to, in temporary questioning, if he suspects that he's going to be attacked or in danger, to pat down the person, take any gun he finds, and then if it's legal, give the gun back. If it's not legal, arrest the guy. So it's not like they're in conflict exactly, but I think there's a sort of hodgepodge. So what is the state saying? The state is arresting this guy and asking about his void card at the station? I think that what we have to look at is, what is the evidence that shows that the possession itself was unlawful? And we do that through, as I partially was saying in the previous case, not just the fact that you have possession, but what is the conduct of the defendant in possessing that gun? Because we know that someone who possesses a gun lawfully will possess it in a manner which is lawful. So if you have a defendant who has a gun who's trying to hide it from the police, that suggests that the defendant himself knows that he doesn't have a void card, he doesn't have concealed carry, he might be a felon or someone who's otherwise prohibited from having the gun. That's what allows us to have the initial stop. And then we might additionally find out through questioning or through the defendant's failure to produce a void card or a concealed carry that that would explain the behavior. But again, we also have to remember, going back to Terry, Terry himself recognized that we're going to have these situations where the police make these judgments based on what they're observing, based on quickly moving situations, and they're occasionally going to get it wrong. And they're going to arrest someone or they're going to stop someone on the street who's innocent. Well, it's clear we have to balance the public policy of letting legal gun owners go about their business and balance that with the very real danger that police face on the street from guns. And I'm just trying to figure out if we're giving the police and citizens the best parameters in which to operate, to guide them. Are we telling the police, if you do this, here's your checklist? Are we telling citizens, here's your checklist? Are we doing, have we done that effectively? Your Honor, I think that, I understand the concern. There's a lot of way the appellate court is, how it's interpreting Aguilar and Burns and all the cases that have come out of it. But I think what we have in this case is simply a defendant who was behind a car and he dropped the gun at that point when maybe he thought that the police wouldn't hear that clink, maybe they wouldn't see him dropping the gun. And that itself is further evidence that this defendant in particular had some knowledge that his possession was unlawful. So on this case, we have facts that show that this is a defendant who knew that the gun was illegally possessed, or at least that reasonable inference is allowable from the record. And so I don't think that this is the case that, that's really gonna allow us to clarify these issues more. I think this is very straightforward in terms of the right of the police to approach this case fairly frankly, and then to make the arrest in the manner that they did. So if there are no further questions. Thank you. Thank you. If I may very briefly, Your Honors, especially in light of the appointment that's coming up from one of yourselves. Initially, our state's council makes a point about the impeached, or tries to make a point that the impeached testimony regarding the purportedly inculpatory statement doesn't go to the officer's credibility, or it doesn't go to the material issues in the case. And again, I mean, I think that's, that's, in our position, that's just flat wrong. The officers only testified about a limited number of things, and they obviously felt that this was important. They admitted as much on their testimony that these details about statements, inculpatory statements, were important. And they do go to this question about whether or not they would be telling the truth about a purportedly inculpatory statement that was or wasn't made. That is critical to assessing whether or not the officers would have fabricated or misremembered the details about the purported possession itself. Now, the state's council also makes a point that there is no question that this gun was a firearm. But that's not, that's not how the burden of proof works. The state has to prove that the object in question was, existed, A, and B, was a firearm. And I mean, if we look at the parallel to narcotics cases, the state, it's not sufficient proof for the state to just say, oh, I saw what I suspected was cocaine, I saw what I suspected was heroin. They are required to prove that what they recovered was something that was prohibited by the statute. And here, all we have is one officer who was thoroughly impeached saying, this is a gun. No other evidence whatsoever to prove that it was, in fact, a gun, that it functioned as a gun, that it wasn't a replica or anything like that to rule out any of those reasonable hypotheses. And again, the state seems to suggest that we're trying to put the Fourth Amendment in this case. I wouldn't say that's necessarily the case. Again, we are citing Campbell for the proposition and the instructions that go to the potential credibility determinations when an officer might have a motive to fabricate here. The Fourth Amendment didn't come up necessarily because the officers didn't... There was no indication prior to trial that there was going to be an issue related to that. Then suddenly at trial, we have the officers testifying, again, incredibly and thoroughly impeached that there was a post arrest statement that was made that was not revealed prior to that point in time. Perhaps if it had, there would have been more thorough litigation on the question of the Fourth Amendment. If there's no further questions, we thank your honors for your time. Thank you. Thank you. Thank you both. You both argued very well and the briefs were fairly readable, decent. So I thank you very much.